UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Miranda K. Coe, | ) | Civil Action No. 5:22-cv-226-KDW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi, Acting Commissioner of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). Having carefully considered the parties' submissions and the applicable law, the court affirms the Commissioner's decision for the reasons discussed herein.

I.      Relevant Background

A.      Procedural History

On March 4, 2020,[1] Plaintiff protectively filed an application for DIB alleging a disability onset date of August 15, 2017. Tr. 165-67. Her claim was denied initially, Tr. 52-53, and upon reconsideration, Tr. 54, and Plaintiff requested a hearing, Tr. 98-100. On August 26, 2021, a hearing was held before an Administrative Law Judge ("ALJ"), and at the start of the hearing, Plaintiff amended her onset date to December 1, 2019. Tr. 33, 49.  During the hearing, testimony

---

[1] Although the Protective Filing Worksheet is dated March 5, 2020, Plaintiff's protected filing date, as indicated in the Decision by the Social Security Administration ("SSA") is March 4, 2020. Tr. 12.

was taken from Plaintiff, who was represented by counsel, and from a vocational expert ("VE"). Tr. 34-49. On September 17, 2021, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 9-23. Plaintiff requested review of the decision from the Appeals Council, Tr. 162-64, but the Appeals Council denied review on January 4, 2022, making the ALJ's decision the Commissioner's final decision for purposes of judicial review, Tr. 1-3. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed January 25, 2022. ECF No. 1.

B.    Plaintiff's Background

Born on June 20, 1977, Plaintiff was 42 years old on her alleged onset date of December 1, 2019.[2] Tr. 168. In a Disability Report-Adult form from March 2020, Plaintiff noted that she completed high school, and she had her Certified Nursing Assistant certification. Tr. 188. Plaintiff listed her only past relevant work ("PRW") as an operator at Bosch. *Id.* Plaintiff indicated that she stopped working on August 15, 2017, because of her conditions, which she listed as degenerative disc disease/chronic lower back pain, major depressive disorder, and diabetes. Tr. 187. Plaintiff indicated that she was 5'6" tall, weighed 240 pounds, and her conditions caused her pain or other symptoms. *Id.*

C.    Administrative Proceedings

Plaintiff appeared with counsel by telephone for her administrative hearing on August 26, 2021. Tr. 29, 31. VE Jack Patton also appeared and testified. Tr. 29.

1.    Plaintiff's Testimony

In response to questions from the ALJ, Plaintiff testified that she was a high school

---

[2] It appears the ALJ mistakenly used the disability onset date from Plaintiff's application instead of the amended disability onset date in the Decision. *See* Tr. 12, 21.

graduate. Tr. 34. She was 5'6" and 227 pounds, and she had begun to lose weight because she did

not have an appetite. Tr. 35. Plaintiff was widowed and lived with her sixteen-year-old and twenty-

year-old sons. Tr. 35. According to Plaintiff, she had a driver's license but had trouble driving

because she had neck problems and had trouble turning her head. Tr. 36. Plaintiff had last worked

at Bosch in 2016 but stopped working to help take care of her husband. *Id.* At Bosch, Plaintiff

operated a component attach line, which required her lift about six pounds. Tr. 37-38. In that

position, she had to sit and stand, and she was not on an assembly line. Tr. 38. In her next position

at Bosch, she performed the job of water spouter, which was "more like a material handler[,]" and

required her to lift fifteen to twenty-five pounds. *Id.* Prior to working at Bosch, Plaintiff worked

at Electrolux as an assembler, which required her to lift less than twenty pounds. Tr. 38-39.

When asked why she felt she could not work, Plaintiff responded,

It's difficult to stand for long periods of time. I can't sit for long periods of time. I
can't concentrate on things. I can't reach out for things. I can't reach above my
head. I just can't do things the way I used to could do them. I can't kneel down. I
can't bend over and stoop down and do things—I just can't do things like I used to
do them without hurting. I hurt. Some days I hurt all day long and can't hardly get
up out of the bed. It's just a painful life. I don't know really how else to explain it.
I just hurt all the time. I hurt my neck. I hurt in my shoulders. I hurt in my hips.

Tr. 39.

In response to questions from her attorney, Plaintiff further described her pain. Tr. 39.

Plaintiff testified that her back pain was constant and radiated down to the back of her knee on her

right. Tr. 39-40. She stated she had recently had an injection on her left side. Tr. 40. Plaintiff had

lumbar surgery in 2006, and she had multiple injections since then—"[t]hey take the edge off." *Id.*

She also had constant neck pain that radiated into her right shoulder. *Id.* Plaintiff had received

injections in her neck that helped temporarily. Tr. 40-41. A traction collar had been recommended

to Plaintiff, but she could not afford it. Tr. 41. On a daily basis, Plaintiff took Meloxicam,

Topiramate, and Tylenol to help with her pain. *Id.* She had been described Belbuca, which she did not take because she was worried about becoming addicted to opioids. *Id.* Plaintiff stated that she lies down about 30% of her day to help with her pain. *Id.*

Plaintiff testified that she could sit with her feet hanging down for ten to fifteen minutes, and she could stand for about ten to fifteen minutes. Tr. 42. She could only walk around for about five minutes before she would need to stop and rest. *Id.* Plaintiff testified she could not lift more than ten pounds "[i]f that . . . ." *Id.* In addition to having problems with looking left and right, Plaintiff also had trouble looking up and down. *Id.* She estimated she could only look down at papers on a table for about five or six minutes. Tr. 42-43. Plaintiff testified that her right shoulder bothered her so much that she could only reach forward for five or six seconds. Tr. 43.

Plaintiff testified that she saw a psychiatrist, Dr. Houssain, for depression and anxiety. *Id.* Her mental health issues had gotten worse since her husband passed away in 2019. *Id.* Plaintiff testified that she had no motivation, energy, or control over her crying. *Id.* She cried five or six times a week. Tr. 43-44. Plaintiff testified she also had trouble focusing and concentrating. Tr. 44. For example, she could not watch a television program without stopping to do something else like a crossword puzzle, a word search, or looking on her phone. *Id.* She had trouble sleeping at night and sometimes only slept between three and four hours, which left her exhausted during the day. *Id.* She bathed once or twice a week. *Id.* She brushed her teeth once or twice a week. *Id.* She used to do those things every day but had gotten to the point where she did not care. Tr. 45. Plaintiff stated, "I just lost my motivation to live between feeling bad all the time and hurting and being fat." *Id.*

### 2. VE's Testimony

The VE described Plaintiff's past work as assembler, Dictionary of Occupational Titles

("DOT") number 723.684-010, SVP 3, semi-skilled, and light exertional level; assembler of small products, DOT number 706.684-022, SVP 2, unskilled, light exertional level; and material handler, DOT number 929.687-030, SVP 3, semi-skilled, generally performed at the heavy exertional level, but medium as performed by Plaintiff. Tr. 46. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past jobs who was limited as follows:

> [S]edentary work except this hypothetical individual could never climb. She could occasionally balance, stoop, kneel, crouch, or crawl. She could occasionally reach overhead. She would be further limited to simple, routine tasks performed two hours at a time with only simple work-related decisions and few, if any, changes in the work setting. She could have occasional interaction with the public.

*Id.* The ALJ indicated she believed the hypothetical would eliminate Plaintiff's past jobs, but the VE stated there were other options, including printed circuit board screener, DOT number 726.684-100, SVP 2, unskilled, sedentary, with approximately 13,000 jobs nationwide; lens inserter, DOT number 713.687-026, SVP 2, unskilled, sedentary, with approximately 6,900 jobs nationwide; and final assembler, DOT number 713.687-018, SVP 2, unskilled, sedentary, approximately 14,000 jobs nationwide. Tr. 46-47. All of those jobs were GED level one or two. Tr. 47. In the second hypothetical, the ALJ added that the individual would be off task 15% or more in addition to regularly scheduled breaks; the VE stated that would preclude competitive employment. *Id.*

Plaintiff's counsel asked the VE to consider an individual who could not sit, stand, and walk in combination for a full eight-hour workday. Tr. 48. The VE indicated there would be no jobs available to that individual. *Id.* Plaintiff's counsel then asked the VE to consider the ALJ's first hypothetical individual with the additional limitation of occasional reaching with the right, upper extremity, and the VE testified all of the jobs would be eliminated because they all required frequent reaching. *Id.* Similarly, if the hypothetical individual was limited to occasional looking

down, that would also eliminate those jobs. *Id.* If the hypothetical individual were to be absent two or more days per month, that would preclude competitive employment. *Id.*

## II.  Discussion

Plaintiff alleges the ALJ committed reversible error by failing to properly evaluate the medical opinions in the record and then formulate the residual functional capacity ("RFC") to reflect her assessment of those opinions. Pl.'s Br. 9-21,[3] ECF No. 13. Plaintiff further alleges that the ALJ who decided her case was not properly appointed, and, as such, she lacked authority to hear and decide Plaintiff's claim. *Id.* at 21-27. Based on these purported errors and deficiencies, Plaintiff seeks remand. *Id.* at 9-27.

### A.     The Commissioner's Findings

In the September 17, 2021 decision, the ALJ made the following findings of fact and conclusions of law:

> 1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.
>
> 2.     The claimant has not engaged in substantial gainful activity since August 15, 2017, the alleged onset date (20 CFR 404.1571, et seq.).
>
> 3.     The claimant has the following severe impairments: degenerative disc disease, diabetes mellitus, obesity, and major depressive disorder (20 CFR 404.1520(c)).
>
> 4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional

---

[3] Because Plaintiff included a separately paginated Table of Contents and Table of Authorities, Plaintiff's internal page numbers do not match the ECF page numbers stamped at the top of each page of her brief. The court uses the ECF page numbers here.

capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she cannot climb. She can occasionally balance, stoop, kneel, crouch, crawl, and reach overhead. The claimant is limited to simple, routine tasks performed two hours at a time with only simple, work-related decisions, and few, if any, changes in the work setting. She can have occasional interactions with the public.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on June 20, 1977 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 15, 2017, through the date of this decision (20 CFR 404.1520(g)).

Tr. 14, 15, 17, 21, 22.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are "under a disability,"

defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if the claimant can return to PRW

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing the inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish the inability to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d

846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    C.    ALJ's Consideration of Medical Opinions

        1.    Standard

For benefits applications filed on or after March 27, 2017, such as Plaintiff's, the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or give special deference to treating source opinions. 20 C.F.R. § 404.1520c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources"). Instead, ALJs consider medical opinions

using five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other factors, such as the medical source's familiarity with the other evidence in the claim or understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). The first two factors, supportability and consistency, are the most important in determining the persuasiveness of a medical source's opinion, and the ALJ is not required to explain the consideration of the other three factors. *Id.* § 404.1520c(b)(2). The new regulations further deem certain evidence "inherently neither valuable nor persuasive." 20 C.F.R. § 404.1520b(c). This includes statements on issues reserved to the Commissioner such as whether the claimant is disabled, is unable to work, or is incapable of doing past relevant work. 20 C.F.R. § 404.1520b(c)(3).

2.    Dr. Loudermilk's Opinion

Plaintiff was referred to Piedmont Comprehensive Pain Management in January 2020 for possible lumbar epidural steroid injections. Tr. 256. At her initial visit with the practice, Dr. Eric Loudermilk examined Plaintiff and formulated her treatment plan, which included prescribing Topamax and scheduling a lumbar epidural steroid injection. Tr. 257. According to the medical records, Plaintiff's insurance company repeatedly denied the steroid injection, and she continued to have low back pain. Tr. 297. She had her first lumbar epidural steroid injection on July 23, 2020. Tr. 423. Less than one month later, she reported that the injection had been "extremely helpful for the pain in her lower back and right lower extremity, decreasing by approximately 70%." Tr. 422. However, because she still had pain in her left lower extremity, she was scheduled for a second lumbar epidural steroid injection. *Id.* On September 3, 2020, she got that injection. Tr. 420. It was also recommended she use Butrans patches, along with Mobic and Topamax. Tr. 421.

11

On September 12, 2020, Dr. Loudermilk filled out a questionnaire where he indicated Plaintiff's first visit with him was in April 2006. Tr. 435. According to Dr. Loudermilk, Plaintiff's diagnosis was failed back syndrome, and her prognosis was poor. *Id.* Her symptoms included pain in the low back and left leg, weakness in her back and legs, fatigue, insomnia, and weight gain. *Id.* Dr. Loudermilk characterized Plaintiff's back and leg pain as "moderately severe." *Id.* As for what clinical findings and objective signs were present, he noted Plaintiff had pain to palpation throughout the low back. *Id.* Her treatment had been lumbar epidural steroid injections, Meloxicam, and Topamax. *Id.* Dr. Loudermilk opined that Plaintiff's impairments had lasted or were expected to last at least twelve months, and emotional factors contributed to the severity of her symptoms and functional limitations. *Id.* In particular, Plaintiff's depression affected her physical condition. *Id.* Dr. Loudermilk opined that Plaintiff's pain or other symptoms would frequently interfere with the attention and concentration needed to perform even simple work tasks. Tr. 436. She was incapable of even low stress jobs. *Id.* She could walk less than one city block without rest or severe pain. *Id.* She could sit for forty-five minutes and could stand for thirty minutes before needing to change positions. *Id.* Additionally, Dr. Loudermilk indicated that, during an eight-hour workday, Plaintiff could stand and/or walk for less than two hours and could sit for about four hours. *Id.* She would need periods of walking around during the workday. *Id.* She would need to walk for five minutes every forty-five minutes, and further, she would need to be able to change positions at will. Tr. 436-37. Dr. Loudermilk opined that Plaintiff needed five-to-ten-minute breaks four or five times during the workday. Tr. 437. She did not need to elevate her legs or use an ambulatory assistive device. *Id.* Dr. Loudermilk indicated Plaintiff could frequently lift less than ten pounds, occasionally lift ten or twenty pounds, and could rarely lift fifty pounds. *Id.* She could frequently look in all directions or hold her head in a static position. *Id.*

She could never climb ladders but could occasionally twist, stoop, crouch, and climb stairs. *Id.* Dr. Loudermilk estimated that Plaintiff would be absent more than four days per month as a result of her impairments or treatment. Tr. 438.

Plaintiff was seen again at Piedmont Comprehensive Pain Management on October 9, 2020. Tr. 453. At that time, she indicated her second injection had been "extremely helpful for the pain in her lower back and right leg but she ha[d] continued to have pain in her left leg rating [sic] down her outer thigh into her foot." *Id.* At that time, she was scheduled for a left transforaminal L4 and L5 nerve root injection with Dr. Loudermilk. *Id.* She received that injection later that month. Tr. 451. In November 2020, Plaintiff reported the injection had provided 40% pain relief. Tr. 450. She continued to experience increased pain and some tingling, but she used medications to manage her pain and was "happy with her pain management treatment plan." *Id.*

In February 2021, Plaintiff returned to Piedmont Comprehensive Pain Management for a refill of her prescriptions. Tr. 501. At that time, she reported that her neck was "popping and catching and causing her extreme pain." *Id.* She was scheduled for an MRI, which showed "multilevel disc bulging with a mild asymmetric disc protrusion to the right at C3-C4." Tr. 499. A cervical traction device was ordered for her, but her insurance would not pay for it, and Plaintiff could not afford it. *Id.* She was scheduled for a cervical epidural steroid injection. *Id.* On April 22, 2021, she received the injection. Tr. 497. Plaintiff reported the injection provided about 60% relief of her symptoms. Tr. 597. She elected to proceed with a second cervical epidural steroid injection, which she received on May 20, 2021. Tr. 595, 597. At her appointment on June 2, 2021, Plaintiff reported that the injections had been "tremendously effective for her neck pain and she [did] not feel she [was] in need of repeat cervical epidurals or injections at [that] time." Tr. 593. Her medications were continued. *Id.* Because Plaintiff reported increased pain in her lower back and

left lower extremity, she was scheduled for a repeat transforaminal left L4 and L5 nerve root injection, which had been "tremendously effective" for her previously. *Id.*

The ALJ considered Dr. Loudermilk's opinion but found it was "not . . . persuasive because [it was] not consistent with the objective findings of his exams nor with the subjective responses the claimant had to treatment." Tr. 20. Plaintiff argues the ALJ's rejection of Dr. Loudermilk's opinion is not supported by substantial evidence because the ALJ did not comply with the regulations, substituted her lay opinion for that of Dr. Loudermilk, and did not properly evaluate the longitudinal evidence regarding Plaintiff's treatment and her response to that treatment. Pl.'s Br. 11-17.

Although the ALJ's analysis is brief, that is not necessarily inconsistent with the regulations, as the new regulations only require the ALJ to discuss consistency and supportability. 20 C.F.R. § 404.1520c(b)(2). Here, the ALJ's greater discussion acknowledges both of those factors. For example, while Dr. Loudermilk had cited Plaintiff's palpation to pain to support his opinions, the ALJ noted Dr. Loudermilk's physical exam showed Plaintiff "was tender to palpation along her lumbar spine, but she did not have pain on range of motion, had a negative straight leg raise, and normal range of motion of her hips . . . ." Tr. 20. Furthermore, while the ALJ's summary of Plaintiff's medical history was fairly succinct, it included Plaintiff's treatment history—the multiple injections Plaintiff received, which resulted in temporary improvement that would eventually subside and require more injections. Tr. 19-20. The ALJ specifically noted that Plaintiff's subjective responses to her treatment were inconsistent with Dr. Loudermilk's opinion. Tr. 20. Notably, at the time of Dr. Loudermilk's opinion, Plaintiff had only received two injections. Thus, the improvement she would see with various injections had not been realized at that point. However, the ALJ's discussion shows the progression of Plaintiff's treatment and the relief the

injections afforded her and how that relief ebbed. *See* Tr. 20. Based on a review of the decision and the record, the court disagrees with Plaintiff's assessment that the ALJ relied upon her own lay opinion or did not consider the longitudinal evidence. The ALJ's decision demonstrates that she relied upon the medical records, including Plaintiff's own reports about the success of her treatments in alleviating her pain and the notes of Plaintiff's treatment providers over the course of the relevant period. Plaintiff's arguments as to Dr. Loudermilk's opinion invite the court to reweigh the evidence, but the court declines to do so. *See Hancock v. Astrue*, 667 F.3d 470, 471 (4th Cir. 2012) ("'In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ].'" (alteration in original) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005))). For the above reasons, the court finds the ALJ's determination as to Dr. Loudermilk's opinion is supported by substantial evidence

3.     Dr. Houssain's Opinion

Plaintiff's medical records indicate she had been diagnosed with recurrent major depressive disorder. Tr. 289. She was referred to Dr. Kashfia Houssain, who she began seeing in September 2020. Tr. 503-11. Plaintiff reported to Dr. Houssain that she had struggled with recurrent depression since her early 20s, but her depression became worse when her mother was diagnosed with cancer in 2011. Tr. 504. In the notes from Plaintiff's initial visit, Dr. Houssain noted Plaintiff's mother died in 2014. *Id.* Since then, Plaintiff had taken on greater care of her father and her disabled brother. *Id.* Plaintiff's husband also passed away unexpectedly in February 2019, and she had felt more depressed since his death. *Id.* As a result of those situational and family stressors, Plaintiff reported she felt depressed daily and, further, felt anhedonic, hopeless, and helpless. *Id.* Plaintiff's sleep was restless and interrupted. *Id.* Her chronic pain also contributed to her mental

state. *Id.* Dr. Houssain adjusted Plaintiff's medication, starting her on Cymbalta and decreasing her Lexapro, and Dr. Houssain suggested other lifestyle changes like decreasing her caffeine intake. *Id.*

On October 14, 2020, Plaintiff reported that the medication adjustments had helped her mood, and she was feeling more rested because her brother was in a rehab facility at that time. Tr. 512. Dr. Houssain increased Plaintiff's Cymbalta medication and instructed her to stop Lexapro in two weeks. Tr. 513. On November 11, 2020, Plaintiff described her mood as "worried." Tr. 518. Plaintiff stated her brother was in the hospital with Covid. Tr. 517. Dr. Houssain again increased Plaintiff's Cymbalta. Tr. 518.

At an appointment on December 29, 2020, Plaintiff indicated her father had moved into a nursing home, and her brother had recovered from Covid and pneumonia and was in a rehab facility. Tr. 522. Plaintiff had felt both emotional and guilty about the change. *Id.* Plaintiff indicated the increased Cymbalta had been helpful. *Id.* Dr. Houssain instructed Plaintiff to continue her medications and then taper off Abilify. Tr. 523.

On February 9, 2021, Plaintiff reported that her brother died in early January, which had made the past month challenging and sad. Tr. 527. Plaintiff's father had moved back in with her, and Plaintiff was taking care of him, which left her physically exhausted and emotionally overwhelmed. *Id.* Plaintiff's medications were continued as prescribed. Tr. 528.

In March 2021, Plaintiff complained that she was struggling with low moods. Tr. 534. In April 2021, Plaintiff stated her mood had been fairly stable, but she had a number of family stressors, including her father and her two sons. Tr. 539. Dr. Houssain continued Plaintiff on her medication regimen. Tr. 540. At her appointment with Dr. Houssain on June 23, 2021, Plaintiff continued to report family stressors. Tr. 567. Plaintiff indicated her belief that the prescribed

psychotropic medications were helping her, and she wished to continue on them. *Id.*

On July 22, 2021, Dr. Houssain filled out a medical source statement. Tr. 563-65. Dr. Houssain opined Plaintiff could frequently follow work rules, use judgment, and function independently. Tr. 563. However, she could only occasionally interact with supervisors and maintain attention and concentration. *Id.* She could rarely relate to co-workers, deal with the public, or deal with work stresses. *Id.* According to Dr. Houssain, Plaintiff's "chronic depression, anxiety[,] and insomnia contribute[d] to [her] limitations." *Id.* As to Plaintiff's ability to understand, remember, and carry out instructions, Dr. Houssain opined Plaintiff could rarely do so with complex job instructions, could occasionally do so with detailed but not complex job instructions, and could frequently do so with simple job instructions. Tr. 564. Dr. Houssain wrote Plaintiff's "chronic depression may cause limitations[.]" *Id.* Dr. Houssain opined Plaintiff could frequently maintain her personal appearance and demonstrate reliability, but she was limited to occasionally behaving in an emotionally stable manner, and she could rarely relate predictably in social situations. *Id.* Dr. Houssain indicated both "[d]epression [and] anxiety can contribute to limitations." *Id.* Dr. Houssain opined Plaintiff's mental impairments would require her to exceed the number of usual breaks during an eight-hour workday and would also interfere with her completing a workday. *Id.* Dr. Houssain offered that Plaintiff would miss about four days of work a month due to her impairments or treatment. Tr. 565. Dr. Houssain indicated Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation, elaborating that Plaintiff's "[c]hronic mood problems interfere with level of functioning[.]" *Id.* Dr. Houssain further wrote, "Patient is tolerating her medications and denies side effects." *Id.*

The ALJ summarized the opinions offered by Dr. Houssain but stated she "[did] not find

these opinions persuasive because they [were] not entirely consistent with each other or with the overall progression of the claimant's treatment." Tr. 19. Plaintiff asserts the ALJ did not properly evaluate the supportability and consistency of Dr. Houssain's opinion as she failed to acknowledge the opinion was consistent with Dr. Houssain's own treatment records and was also consistent with other evidence in the record. Pl's Br. 17-20.

The undersigned disagrees with Plaintiff's analysis. As outlined above, the ALJ's evaluation of Dr. Houssain's opinion goes to the issues of supportability and consistency as required by the regulations. First, the ALJ addressed supportability by finding the opinion was internally inconsistent. Although the ALJ did not further elaborate as to what was inconsistent, she noted Dr. Houssain opined Plaintiff could not complete an eight-hour workday and would be absent four days per month but also she could demonstrate reliability. Tr. 19. Second, the ALJ addressed consistency by finding Dr. Houssain's opinion was not entirely consistent with the overall progression of Plaintiff's treatment, and the RFC discussion offers greater context for that finding. The discussion includes a summary of Plaintiff's reported symptoms throughout the time she was seeing Dr. Houssain. Tr. 18-19. The ALJ also noted, Plaintiff's

> medical record does show that she has a history of depression that has had some effect on her ability to handle stress, concentrate, and interact with others, though her limitations are not marked. Additionally, her records have also shown she has responded well to proper treatment, even during unfortunate situational stressors.

Tr. 21. Again, Plaintiff asks the court to reweigh the evidence already considered by the ALJ, but the court declines to do so. While Plaintiff asserts there is evidence both in Dr. Houssain's records and in others that supports her opinions, the court finds the ALJ adequately addressed such evidence in the decision. Notably, ALJs are not required to specifically discuss and analyze every piece of evidence in the case in their narrative opinions so long as it is possible for the reviewing court to realize that all relevant evidence was considered, though not written about, in reaching the

ultimate decision. *Phillips v. Barnhart*, 91 F. App'x 775, 780 n.7 (3d Cir. 2004) ("[T]he ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it."); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (finding that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection" insufficient to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole). Having reviewed the decision in its entirety, along with the medical records, the court finds the ALJs evaluation of Dr. Houssain's opinion is supported by substantial evidence and sufficient to allow meaningful judicial review.

### 4.     Other Medical Opinions

Plaintiff briefly argues the ALJ erred in evaluating other medical opinions of record. Pl.'s Br. 20-21. In particular, she points to the opinions by consultative examiner Dr. Rebecca Sorrow and state agency consultant Dr. Timothy Laskis. *Id.* The ALJ offered the following analysis of these opinions:

> A consultative exam was conducted by Dr. Rebecca Sorrow in March 2021 (10F). The claimant told the examiner that she initially stopped working because her mother and her husband got sick, and that she could not physically handle working (10F/1). The claimant stated her mood had been sad for as long as she could remember and that she had problems with attention and concentration (10F/2). The claimant's affect was tearful during the evaluation, but she was cooperative, polite, and able to relate fairly well (10F/2, 3). She had an average range of intellectual functioning, earned a perfect score on a cognitive abilities test, and had a global assessment function of 65 (10F/2-3). Dr. Sorrow opined the claimant was probably capable of the concentration needed to perform simple tasks and follow basic instructions (10F/3). She thought the claimant's depression would not significantly interfere with the claimant's ability to perform complex tasks, follow complicated instructions, or adapt to change (10F/3). The undersigned finds these opinions partially persuasive because they are generally consistent with her exam, however, the claimant's long-term mental status exams support further limitations in her mental health functioning.

. . . .

> The state agency medical consultants at the reconsideration level [including Dr. Laskis] . . . thought . . . that she had mild limitations in her ability to understand, remember, apply information, and adapt to moderate limitations in her ability to interact with others, concentrate, persist, and maintain pace (5A/7). The undersigned finds these opinions partially persuasive because they are consistent with the claimant's medical records.

Tr. 19, 20-21.

As to Dr. Sorrow's opinion, the ALJ recognized Dr. Sorrow's finding that Plaintiff "was probably capable of the concentration and focus needed to perform simple tasks and follow basic instructions[,]" and the ALJ found that opinion to be "partially persuasive . . . [with the caveat that] long-term mental status exams support[ed] further limitations in her mental health functioning." Tr. 19. Plaintiff now argues the ALJ "did not explain how the RFC finding . . . adequately accounted for these further limitations." Pl.'s Br. 20. However, Plaintiff's arguments take the ALJ's reasoning out of context. When viewed in its entirety, the ALJ's explanation that "long-term mental status exams support further limitations in her mental health functioning" is not unclear. Indeed, the immediately preceding sentence notes Dr. Sorrow's opinion that Plaintiff's mental health impairments "would not significantly interfere with the claimant's ability to perform complex tasks, follow complicated instructions, or adapt to change . . . ." Tr. 19. The RFC crafted by the ALJ limited Plaintiff in all of those areas based on other records. The ALJ's assessment of Dr. Sorrow's opinion and the resulting RFC limitations are supported by substantial evidence.

Plaintiff argues Dr. Laskis found Plaintiff "might not be suited for work with the general public[,]" and while the ALJ found his opinion partially persuasive, she "did not explain how her RFC assessment limitation to occasional interaction with the public adequately accounted for" that finding. Pl.'s Br. 20-21. The court finds the decision as a whole provides more clarity into the

ALJ's determination that Plaintiff was limited to occasional interaction with the general public—in particular, in her Step 2 analysis, the ALJ found Plaintiff had moderate limitations in interacting with others. Tr. 16. The ALJ noted that although Dr. Houssain opined Plaintiff could rarely interact with the general public, Plaintiff's primary care physician opined she could relate to others. *Id.* Thus, when the decision is viewed as a whole, there is substantial evidence for the RFC limitation of occasional interaction with the public. Furthermore, as pointed out by the Commissioner, the jobs identified at Step 5 do not require interaction with the public. Def.'s Br. 14, ECF No. 14. Thus, any error in this respect is harmless. The court agrees.

     5.     The ALJ's RFC Discussion

Plaintiff argues generally that the ALJ failed to build an accurate and logical bridge from the evidence to the RFC determination. The court disagrees. As explained above, the ALJ's narrative discussion of the medical opinions allows for meaningful judicial review, particularly when considered as part of the decision as a whole. Accordingly, the court finds substantial evidence supports the RFC determination, and remand is not warranted on that basis.

     D.     Whether the ALJ Was Properly Appointed

Plaintiff argues the ALJ who decided her case was not properly appointed and, thus, lacked the authority to hear and decide Plaintiff's claim. Pl.'s Br. 21-27. Underlying this argument is the foundation that ALJ Petri was not properly appointed to her position because she was not appointed in accordance with the Appointments Clause. *See Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051-54 (2018) (finding Securities and Exchange Commission ("SEC") ALJs were "Officers of the United States" and, thus, under the Appointments Clause, could only be appointed by the President, a court of law or the head of the department). The Commissioner does not dispute this. *See Carr v. Saul*, 141 S. Ct. 1352, 1357 (2021) ("Like the SEC ALJs at issue in *Lucia*, SSA ALJs had been selected by

lower level staff rather than appointed by the head of the agency."). However, on July 16, 2018,

well before Plaintiff's case was heard and decided, Nancy Berryhill, who was then serving as the

Acting Commissioner of the SSA, "ratified the appointments of [the SSA's] ALJs and approved

of those appointments as her own." SSR 19-1p, 2019 WL 1202036, at *9583 (Mar. 15, 2019).

Plaintiff now argues that ratification was ineffective because, at the time of the ratification,

Berryhill was not properly serving in the role of Acting Commissioner of the SSA.

　　　To briefly explain how Berryhill became Acting Commissioner of the SSA, Berryhill

initially served in that role pursuant to a memorandum by President Obama that designated the

Deputy Commissioner of Operations ("DCO"), which Berryhill was, as first in line to serve as

Acting Commissioner if the positions of Commissioner and Deputy Commissioner of Social

Security were both vacant. *See* 81 Fed. Reg. 96337, 2016 WL 7487744, at *96337 (Dec. 23, 2016).

Berryhill began serving as Acting Commissioner on January 21, 2017. *See* U.S. Gov't

Accountability Office ("GAO"), No. B-329853, "Violation of the Time Limit Imposed by the

Federal Vacancies Reform Act of 1998–Commissioner, Social Security Administration,"

www.gao.gov/assets/b-329853.pdf, at 1 (Mar. 6, 2018) ("GAO Letter"). In accordance with the

Federal Vacancies Reform Act ("FVRA"), her term as Acting Commissioner should have ended

on November 16, 2017, according to the GAO. *See* GAO Letter at 2.

> Following the GAO Notice, Berryhill stepped down as Acting Commissioner but
> continued to lead the SSA as DCO. On April 17, 2018, President Trump nominated
> Andrew Saul to the position of Commissioner of the SSA, an action which the SSA
> interpreted as permitting Berryhill to resume serving as Acting Commissioner as of
> that date under Section 3346 (a)(2) of the FVRA, the so-called "spring-back"
> provision.

*Brooks v. Kijakazi*, 2022 WL 2834345, at *14 (internal citations omitted). Berryhill ratified the

appointment of the SSA ALJs after she resumed serving as Acting Commissioner pursuant to the

spring-back provision. Plaintiff asserts the FVRA did not permit her to resume her role as Acting

Commissioner and, thus, her ratification of the ALJs was null.

Under the FVRA,

[T]he person serving as an acting officer . . . may serve in the office—

> (1) for no longer than 210 days beginning on the date the vacancy occurs; or

> (2) . . . once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

5 U.S.C. § 3346(a).[5] Plaintiff argues that the FVRA did not permit Berryhill to resume her role as

Acting Commissioner under § 3346(a)(2) when she had already served the full 210 days allowed

by § 3346(a)(1). Pl.'s Br. 22-23. Plaintiff relies, in part, on *Brian T.D. v. Kijakazi*, a case in which

a district court in Minnesota found that the plain language of § 3346(a)(2) provided for tolling the

210-day period during the pendency of a nomination but not for a "spring-back" allowance where

one could resume the role of acting officer after the expiration of the 210-day period. Case No. 19-

cv-2542 (DTS), 580 F. Supp. 3d 615, 626-36 (D. Minn. Jan. 20, 2022). In *Brian T.D.*, the court

explained "[t]he ordinary use of the word 'or' is disjunctive, indicating an alternative[,]" and in §

3346, the "or" between subsections (a)(1) and (a)(2) "serves to provide an alternative length of

service not to create a series of non-contiguous periods of service." *Brian T.D.*, 580 F. Supp. 3d at

631. The court also reasoned,

> Congress, in enacting § 3346, used the present participle "serving," rather than the past or present perfect "served" or "has served." Section 3346(a) applies to "the person serving as an acting officer" under § 3345. By its terms, then, the section applies to the person presently serving in that capacity and not to a person who had

---

[5] Under a separate provision, for vacancies existing during the first 60 days after a Presidential transition, the 210-day period begins to run from the later of 90 days after the transition or 90 days from the date the vacancy occurs. 5 U.S.C. § 3349a. This explains why the GAO calculated Berryhill's authorized term as Acting Commissioner as 300 days after she first assumed the role.

previously served as Acting Commissioner. Berryhill was "the person serving as an acting officer" from January 20, 2017 until November 16, 2017 when her term expired. When Saul was first nominated to become Commissioner on April 17, 2018, Berryhill was not then serving as Acting Commissioner and Saul's nomination did not create a new vacancy. Therefore, by its plain language, § 3346(a)(2) does not apply to Berryhill because she was not serving as Acting Commissioner when Saul was nominated.

*Id.* at 629.

Other courts, including several within the Fourth Circuit, have rejected the reasoning offered by *Brian T.D. See Allison v. Kijakazi*, 1:21CV890, 2023 WL 143201, at *21 (M.D.N.C. Jan. 10, 2023) ("[T]he plain language of Section 3346(a) of the FVRA makes clear that Section 3346(a)(2) provided authority for Berryhill to resume service as Acting Commissioner as of the date of President Trump's nomination of Saul for Commissioner . . . . Further, the FVRA's legislative history, caselaw interpreting Section 3346(a)(2), and interpretations of that Section from the DOJ and GAO all support the interpretation of Section 3346(a)(2) as a spring-back provision."); *Brooks v. Kijakazi*, 1:21CV609, 2022 WL 2834345, at *15-22 (M.D.N.C. July 20, 2022), *adopted by* 2022 WL 17832126 (M.D.N.C. Aug. 19, 2022); *Lance M. v. Kijakazi*, 2:21-cv-628, 2022 WL 3009122, at *14 (E.D. Va. July 13, 2022) ("I am not alone in rejecting *Brian T.D.*'s interpretation. Other courts in the Fourth Circuit have also found it unpersuasive."); *Williams v. Kijakazi*, 2022 WL 2163008, at *3 (W.D.N.C. June 15, 2022) ("*Brian T.D.* . . . is an outlier that conflicts with the plain text of the FVRA, nearly every other court to address the issue, as well as the view of the Executive Branch and Legislative Branch—all of which agree that § 3346(a)(2) permits an acting official serving under the FVRA to serve during the pendency of a first or second nomination even when that nomination was submitted after the initial 210-day period for acting service has expired."); *Early v. Kijakazi*, No. 5:21-CV-00096-KDB, 2022 WL 2057467, at *4 (W.D.N.C. June 7, 2022) ("Other courts have considered this issue and have found that §

3346(a)(2) 'contains a "spring-back" provision that enabled Berryhill to resume her role as Acting

Commissioner as of the date that Andrew Saul was nominated for Commissioner in April 2018.'"

(quoting *Thomas S. v. Comm'r*, No. C21-05213-MAT, 2022 WL 268844, at *3 (W.D. Wash. Jan.

28, 2022))).

　　While none of this authority is binding, the court finds the analysis offered by these Fourth

Circuit courts to be very persuasive. Generally, the analysis begins with looking at the plain

language of the statute. Many of the courts note the word "or" can be interpreted as either inclusive

or exclusive. In *Allison*, the court found the following to be helpful in explaining the difference

between those interpretations:

> "The use of 'or' to mean either one or both of two options is routine. 'The word
> "or" has an inclusive sense (A or B, or both) as well as an exclusive one (A or B,
> not both).' *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015). '"The meaning of
> or is usually inclusive."' *Tex. Std. Oil Co. v. Forest Oil Corp.*, No. 05-490, 2008
> WL 11399510, at *4 (S.D. Tex. Jan. 3, 2008) (quoting Bryan A. Garner, *Dictionary
> of Modern Legal Usage* 624 (2d ed. 1995)). For example, if a server comes to a
> table and asks whether anyone would like 'dessert or coffee,' no one would
> interpret that to preclude ordering both."

*Allison*, 2023 WL 143201, at *17 (quoting Comm'r's Br.). Using that and other authority, the court

found "the word 'or' in Section 3346(a)(1) [should be interpreted] in its more common, inclusive

sense to permit Berryhill to serve both as Acting Commissioner for 300 days following the vacancy

under Section 3346(a)(1), and to spring back into that role upon Saul's nomination to the Senate

under Section 3346(a)(2)." *Id.* at *18. In *Allison*, the court noted that another aspect of *Brian T.D.*'s

reasoning—the use of "serving" in § 3346(a), as opposed to some other conjugation of "serve"—

led to an absurd result when carried to its conclusion:

> That argument . . . glosses over the fact that using "the past or present perfect
> 'served' or 'has served'" to set out the time limits for acting officials under the
> FVRA would not make sense. Had Congress drafted Section 3346(a) to provide
> that "the person [who served or has served] as an acting officer as described under
> section 3345 may serve in the office for no longer than 210 days," 5 U.S.C. §

3345(a)(1) (dashes and number omitted), the Section, by its terms, would provide service time limits only for individuals who had already served as acting officers, which renders the time limits nonsensical.

*Id.* This court agrees with the analysis offered by the court in *Allison*, which echoes the findings of many other courts—the plain language of § 3346(a) provides a spring-back provision. This interpretation is supported by the legislative history and is consistent with guidance from the Office of Legal Counsel and case law outside of the SSA context. *See, e.g.*, *id.* at \*18-21(noting the Senate Report statement that "[u]nder new section 3346(a)(2), . . . [t]he acting officer may serve <u>even if</u> <u>the nomination is submitted after the 150 days has passed</u> although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted'" (quoting S. Rep. 105-250, 1998 WL 404532, at \*14 (emphasis added in citation))).

In arguing that § 3346(a)(2) should not be read to provide a "spring-back" provision, Plaintiff further relies on language from *NLRB v. S.W. General, Inc.*, 580 U.S. 288, 296 (2017), where the Supreme Court described § 3346 as follows: "In most cases, the statute permits acting service for '210 days beginning on the date the vacancy occurs'; tolls that time limit while a nomination is pending; and starts a new 210-day clock if the nomination is 'rejected . . ., withdrawn, or returned.'" 580 U.S. at 296 (quoting § 3346(a)-(b)(1)). However, as noted by the Commissioner, in *NLRB*, the Supreme Court was focused on how § 3345, not § 3346, should be interpreted. *See* Comm'r Br. 25. Thus, "[t]he Supreme Court's use of the word 'toll' in the background should not be given talismanic significance because, as the Court itself has explained, it is 'undesirable . . . to dissect the sentences of the United States Reports as though they were the United States Code.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). This court would further note that the Supreme Court described the application of § 3346 "[i]n most

cases," and, of course, § 3346(a)(2) plainly provides for tolling in some circumstances, but that does not prevent it from providing a "spring-back" provision, as well. *See NLRB*, 580 at 296.

The court agrees with the majority of the courts to have considered this issue—the plain language of the FVRA provides that Berryhill could resume her role as Acting Commissioner of the SSA as of the date Andrew Saul was nominated for Commissioner. Other authority supports that interpretation, as well. Accordingly, ALJ Petri's appointment was ratified by Berryhill while she was validly serving as Acting Commissioner, and there is no merit to Plaintiff's argument that ALJ Petri lacked authority to hear her claim. The court denies Plaintiff's request to remand on that basis.

III.    Conclusion

The court's function is not to weigh evidence or substitute its judgment for that of the Commissioner but is to determine whether the ALJ's weighing of the evidence is supported by substantial evidence in the record. *See generally Hays v. Sullivan*, 907 F.2d at 1456 (noting judicial review limited to determining whether findings supported by substantial evidence and whether correct law was applied). Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. Accordingly, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

January 27, 2023                                Kaymani D. West
Florence, South Carolina                        United States Magistrate Judge